If you'll please the Justices, I am Jim Seedorf and I represent Plaintiff Appellant Dwight Greene in this racial discrimination case. Mr. Greene was a branch manager. No, Judge Wallace commented earlier, there's no amplification unless you speak about twice as loud. Okay. Then I can hear you. I'll ignore this and try to do that. Mr. Greene was a branch manager for Kinko's here in Anchorage prior to his discharge in early 2004. Mr. Greene appeals from a summary judgment issued below. The court below found that he had not shown a prima facie case on the evidence that was presented. We believe that the case law by this court and by the United States Supreme Court has set some guidelines that call for a different result in the matter. Could I get to the point that's bothering me? Sure. That is this. It seems to me that you have an argument. If Collins was treated differently and you can determine from that that it was because of racial animus. But I'm having difficulty in the record indicating where Collins was treated differently. Your client testified that he understood he was, but I didn't find anything in the record that he was treated differently. Maybe you can point to me in the record where that is. That would help me. Well, I believe Mr. Collins in his testimony had indicated that his relationship with Mr. Kuhn was always a very positive relationship. With Mr. Kuhn? Mr. Kuhn, his supervisor, the man who was doing the evaluation. I don't think there's any doubt that Kuhn had animus against your client. There's questions whether it's racial or he just didn't like him. And so that testimony doesn't help. What I'd like to find out is where he treated him differently. Where is the evidence in the record? Well, I think the evidence in the record goes to several different points in which there was testimony by Lisa Sagers, who was the branch manager in Fairbanks, and there was testimony by Scott Yaskel, who was a salesman officed in the same branch that Mr. Green operated. Did they testify about Collins getting things that Green didn't? They testified as to the relationship between Collins and Kuhn being much more positive. I understand. I got that. And they testified as to the equipment that was provided. Okay, where was that in the record about Collins asking and Green asking for equipment, Collins getting equipment, Green not getting it? I think it's both in the testimony of Mr. Green, and I believe Mr. Collins acknowledged that he received that equipment in his testimony as well. Now, Green said, I heard that, so that's not helpful, that's just hearsay. Collins said he got equipment, he ordered, and Green didn't. I believe that his testimony confirmed that he did, in fact, have equipment upgrades. That Green didn't get. I don't know that Collins says that Green didn't get it, but I think Collins said that he did get equipment upgrades. It's the Collins testimony where I get that. And I believe in terms of the personnel issue, the staffing issue, it is relatively clear both from Green's testimony and that of Scott Yaskel that the Northern Lights branch was terribly understaffed during the 2003 time frame, and I believe the testimony of Mr. Collins was that he was able to do the hiring that kept his facility operating at normal levels. In spite of a hiring freeze all over the company? That was my understanding. That's what Collins testified to? I'm not sure it's as explicit as that, but I think he said he did have a hiring authority, and that when he ran it by Mr. Kuhn. He had a hiring authority, which Green didn't, and they said, well, Green doesn't choose very well. But did Collins actually hire people and Green wasn't able to? That is my understanding. And that's from Collins' testimony. And I believe that is from Collins' testimony. Thank you. Mr. State Officer, let me express my views about the difficulty of your case and see if you have any response. As I read this case, your client was promoted again and again, given awards, favored. There was certainly no trace of racial animosity in his rise and awards. Kinko's liked him. Then there's a change in management. The new manager doesn't like him. But in addition to that, the objective scores at his store fall. His record is lousy. It seems like a case of a man promoted over his head. He's not performing. So poor performance, not prejudice, seems to be the key. And I don't know where the evidence comes that the one man who disliked him was prejudiced against African Americans. Well, let me address that in two parts, if I could. First, with respect to the poor performance issue. I've talked about staffing and I've talked about equipment. And those are really key concerns because the scoring system that they're utilizing and that they're basing their determination on is one that is based upon customer expectations. It calls for on time, done right, mystery shopper evaluations and customer surveys. If you don't have adequate equipment, if you don't have enough staffing, you're not going to be able to keep up with things and you're not going to get them done on time. If you don't have the staffing to double check jobs, there are going to be errors. If there are errors and if things aren't done on time, the customers are going to be dissatisfied and the surveys are going to come back poorly. They all tie back to the ability of Mr. Kuhn, the individual who mimicked a monkey, directed at the black manager in Kinko's as making those decisions and withholding that support. When you try to make something out of that incident, it amounts to about a scintilla. Mr. Green brought up the story. Mr. Hume was trying to diffuse a little tension. It really doesn't come to a drop of prejudice. I know that's all you've got, so you do your best with it, but it's not very much. The meeting in which that occurred was a meeting of four people. They sat around a table with Mr. Kuhn on one end and Mr. Green on the other, Mr. Green telling a story and everyone looking at Mr. Green. Mr. Kuhn is in the back of the room. He brought up this unpleasant story. He did indeed. I don't know whether it was a racial thing or not, but he must have thought it was derogatory to tell it. So he tells it and puts that on the table, right? He raises the story. That's correct. What's he doing that for? As an example. An example of what? A discussion of something that had just happened as he was coming back. So he couldn't have felt that he was telling a story derogatory to him as an African-American, could he? No, and at that point it was his, and the customer, in fact, did not know that there was a black manager in that store, so he didn't attribute any racial bias to the customer. So the whole racial thing comes out of what you claim. The racial aspect, it comes out of the fact that Mr. Kuhn, in the back of the room where only Mr. Green is looking at him, does the mimicry of a monkey. Yes, it is a lighthearted situation up until that point in time. That very quickly turned, and the testimony is that meeting became very tense thereafter as a result of that particular event. It could not be that Mr. Kuhn was doing that mimicry for the benefit of the others because they weren't looking at him. Well, maybe he was doing it for Green. They fuse it. It certainly wasn't taken that way, and it seems to me, given the historical context. Did Green say anything at the time? Not at the time. But given the historical context of the use of the monkey term with respect to black Americans in this country, it's not surprising that he would have taken that type of offense, and indeed. But if he tells the story, he's obviously not taking the offense. Well, and I don't think he was expecting that kind of reaction from the supervisor, and I don't think it's ever appropriate for a supervisor with respect to a black employee to make that kind of a demonstration. Let me ask a question, Counsel. We've kind of explored Kuhn and what a marvelous person he was who ended up just properly fired by KUCL, as I might add. The actual person who dismissed your client was Clark, and I was looking in the record how this ties into Ms. Clark. As far as I could tell from the record, there's no indication that she was involved at all in these episodes dealing with Kuhn. Is there record evidence that she had racial animus when she terminated him? I cannot point to a specific racial remark or context for Ms. Clark. However, Ms. Clark acted after there was a complaint by Dwight Green that was not fully investigated because it was an ambiguous investigative decision. They said, we don't know if it happened or not. She nonetheless went forward and implemented a variety of disciplinary steps against Mr. Green, and she reintroduced Mr. Kuhn into the supervisory relationship after a short hiatus. Aside from that, before doing so, she approached Mr. Green and said, can't we just drop all of this and we'll move on? Yeah. Instead of when Mr. Green said, but it happened, I can't just forget it, she proceeded with the efforts to terminate him. That all relates to your retaliation claim, doesn't it? That does relate to the retaliation claim. But I think given the context in which she did that, that supplies, in effect, she gave effect to the racial animus that we see with respect to Mr. Kuhn. At the time that she actually terminated him, or decided to terminate him, she decided to keep him on for a while so that he could get stock auction benefits when Keeker was merged with FedEx. Correct. That doesn't sound like racial animus. So what you're saying, in spite of that, she somehow is tarred by what this very, very inappropriate conduct of Kuhn, who obviously didn't like Green. Obviously he did not. And, yes, I think there was a policy within the company, and I don't think it was her policy, that they were keeping people on and they were not terminating them with respect to the possibility that they would lose any benefits under the merger agreement. The stock options. The stock options, that's right. And I have, I know, exceeded my time. So if there are more questions. We'll allow you one minute of rebuttal. All right, thank you. Thank you. May it please the Court, my name is Tom Daniel, and I represent FedEx Keikos, and to my right is Mr. Jacob Nist of my office, who has assisted on the brief. A couple of points I want to make about this case. First of all, it was stated by the appellant that this case, if the Court looks at U.S. Supreme Court precedent and federal law, it might reach a different decision. I would like to remind the Court that this case arises under the Alaska Human Rights Act and not Title VII of the Civil Rights Act. And even though the Alaska Supreme Court often looks to federal law for guidance, this case is, in fact, brought under state law, not Title VII. They don't really materially depart. They do not materially depart except the same structural framework. Same political framework that we follow. Are you suggesting we shouldn't use Ninth Circuit cases or ought to look at Alaska cases? No, in fact, we cite numerous Ninth Circuit cases in our brief. But one point where I think there might be a difference is on the prima facie case. As the Court, I'm sure, is aware, the prima facie case burden under federal law is slight. But in this case, the Alaska Supreme Court has said that one of the essential elements of a prima facie case, that is to create that presumption of discrimination, is that the plaintiff must demonstrate that he was performing his job according to the legitimate expectations of his employer. And if there's one fact in this case that is crystal clear, that is that Mr. Green was not performing his job according to the legitimate expectations of his employer. As I understand it, Mr. Green's position, his counsel's position here, is that when you use the word legitimate expectations, they call that into question with Kuhn's alleged bias in the evaluations and assignment of equipment and whatnot. But the point on which Green got into trouble with FedEx Kinko's was his persistently low MSM scores, the mission statement measurement. And those scores could not be influenced by Mr. Kuhn. These are scores that come from customer ratings, mystery shoppers, computer generated information about on-time performance. Counsel's argument is that you can't rely on the MMS because Kuhn has taken away the opportunities of Green to be a superstar by not providing him the opportunity for the people he needs, by giving other people equipment. He doesn't get the equipment, therefore it's late, and he gets a bad rap for that. What's your response to that? My response to that is, first of all, there is not any clear and persuasive evidence in the record that that affected the MSM scores at all. Is there evidence that it occurred? The only evidence in the record is that Mr. Green said there was one point two or three years prior to 2003 when he didn't get a faster computer than he wanted, and he asked Mr. Kuhn, and Mr. Kuhn said, I can't give you a newer computer until the lease expires. And there's absolutely no rebuttal of that explanation, none. And with regard to the staffing, Mr. Green said he had to get approval from Mr. Kuhn in order to hire additional staff, and Mr. Kuhn says, yes, that's right, because you have a history of making poor staffing decisions. And again, that explanation has never been rebutted. So that's the only evidence. Counsel said that there was some evidence by Collins, that Collins said that he got equipment when Green didn't. Now, I haven't found that in the record. I haven't found that. The only thing I found in the record on that is Mr. Green's statement that Mr. Collins told him that he got faster equipment. But there's no testimony by Collins. Not that I recall. Okay, what about the staffing? Counsel indicated that Collins testified that he got equipment and employees when Green didn't. Well, I don't know that there's any testimony that he got equipment and people. I think there is testimony in the record that Mr. Collins did not have to get approval to hire assistant managers. And the explanation for Mr. Kuhn is because Mr. Collins had MSM scores that were in the high 90s, well above company expectations. Mr. Kuhn was wanting to have approval on Mr. Green's hires, he says, because of Kuhn's history of hiring bad managers. Okay, you've answered your argument on that. But if I understand correctly, you say Collins, to your recollection in the record, Collins did not testify that he got equipment when Green did. And he did not get employees when Green didn't, except that Green has to get approval. That's correct. Because if that's so, if that evidence is there, it seems to me there's a good argument that there's enough evidence that the MS are skewed because of tinkering in advance by Kuhn. But your argument is there's no such evidence. There's no evidence like that. And secondly, there's no evidence that even if there was a delay in getting a computer or there was a delay in getting assistant managers, there's no evidence that that directly affected the MSM scores. And keep in mind that Mr. Green's MSM scores were persistently low over a period of three years. This didn't just happen overnight. It wasn't because of one year. Mr. Green was repeatedly warned at least five times in writing that his MSM scores were low. At the same time, he was being highly praised for the financial performance of his branch. And during all of that time... That was before Kuhn became a manager? No, that was while Kuhn was a manager. In fact, if you read the performance reviews, you'll see that Mr. Kuhn's reviews are very positive to Mr. Green. The only criticism was the low MSM scores. And in response to that, Mr. Green never says, Well, you need to get me a faster computer. You need to let me hire more managers. In fact, in his deposition, when first asked about this, his response is, Well, I don't really believe the MSM scores matter. I don't think it's a valid measure of customer satisfaction. But that's a decision that the company is entitled to make, not Mr. Green. And so that's why we say he failed to meet the legitimate expectations of his employer. Now, the audits, they were low. But the argument is they are subjective. Did the company rely on the audits as well as the MSMs or just the MSMs? The company just relied on the MSMs for discipline, the warning letter and the ultimate discharge. The audits are reflective sometimes of what goes in the MSM and actually are used as an exercise to try to improve the MSM scores. But they did not play a role in the decision to discipline or discharge Mr. Green. What about Mr. Green's retaliation claim? Well, Mr. Green's retaliation claim I think suffers because the evidence shows that he was on the verge of being discharged in May, June of 2003 before he ever submitted an internal claim of discrimination. And after that was submitted, FedEx Kikos even removed Mr. Kuhn from supervising Mr. Green for a period of two months. The undisputed record evidence is that they did that to take a second look at Mr. Green's performance with Mr. Kuhn out of the picture. And the conclusion they came to after that three-month period is that the problem was Mr. Green, not Mr. Kuhn. That the problem was that Mr. Green was not managing his store according to the FedEx standards. His MSM scores were still suffering. And so I simply don't see the causal connection evidence in this case. Where is that determination recorded? I'm sorry, I missed that question. Was that determination recorded in the memorandum? The determination that it was not. After they removed Kuhn from the picture, the role of manager, where is the determination made that the real problem, the root problem is just Green? Well, that is not recorded in a memorandum anywhere. Although there is one memorandum that was written by the manager over Kuhn, the Vice President Clark, who said after she visited the store that according to her observation, Mr. Green was not managing the store according to company expectations. And so she could see why his MSM scores were low. So it is in that memorandum. It's also in the testimony of Ms. Clark. It's also in the testimony of the depositions of some of the Vice Presidents who were taken in this case. And also the record itself of the MSM scores during that period. Why isn't it when Ms. Clark goes to Green and says, why don't you just forget this claim against us and let's start over? Why doesn't that show some evidence of retaliation when he says, no, I'm not going to do it? Well, first of all, I don't think she actually said, why don't you forget this claim? What she said was, can we work this out? Are you willing to try to work together again with Mr. Kuhn? And he says, no. And I fail to see what's retaliatory about that. She was asking him, are you willing to give Mr. Kuhn a second chance? And Mr. Green says, no. During that conversation, was his claim mentioned? His claim based upon race and religious discrimination? I don't believe the testimony is that it was mentioned, but I think it's fairly obvious from the record that that may have been on everybody's mind because Mr. Green had just filed an internal complaint against Mr. Kuhn. And Kuhn was alerted or informed that Mr. Green had filed a complaint. Mr. Kuhn was initially informed orally that Mr. Green had filed a complaint. And he asked Green about that. And he asked Green about it when he visited the store. But when that complaint was initially filed, the undisputed testimony is that Green was not informed that it was a discrimination complaint. He was just informed that it was a complaint about Ron Kuhn. And then your honor is correct. The record shows that when Mr. Kuhn, who was already scheduled to visit the store, did visit the store for one of his regular visits, he asked Mr. Green about his complaint. Not long after that, Mr. Green received a rather low inventory score. He received a very low audit score. And the evidence shows that Mr. Green was with Mr. Kuhn when that audit was conducted. And yet Mr. Green could not identify a single item that was rated incorrectly by Mr. Kuhn. I believe my time is up, but if the court has other questions. Thank you. Went up for rebuttal? Quickly touch on just a couple things. First, with respect to Mr. Collins and his testimony, I think what you will find in that testimony is he said that he had the ability to hire. I don't think he commented on Mr. Green's ability to hire. With respect to the retaliation issue, Kinko's. Wait a minute. Earlier I had my notes here, and I could have them wrong, that you indicated that if I read Collins' testimony, I would find out that he asked for equipment, which he got, and Green didn't. And he got employees that Green didn't. That's in Collins' testimony or not? I think you will find that Mr. Collins' testimony said I was able to hire, I was able to get equipment. I think you will find in Green's testimony I was not able to hire, I was not able to get equipment. So it isn't just in Collins' testimony. He didn't make the comparison. Not the whole story. I think you have to look at them together. With respect to the July meeting, I don't believe there was a decision to terminate Mr. Green or discharge him as of July of 2003 when Mr. Kuhn went to Alaska, and I think you can see that from the affidavit of Heather Clark, which was submitted as part of their materials in the summary judgment motion. Your voice is dropping. I'm sorry. I keep thinking about this. I think you will find the testimony in Heather Clark's affidavit that there was not authority to terminate Mr. Green as of July 2003. The performance during the third quarter of 2003 when there was an interim manager with respect to Mr. Green, I think if you look at the scores, and I've outlined those in our brief, I think you will find there was a significant improvement in his performance when he was under a different manager from Ron Kuhn, and I think that is largely because the scoring of these things is very subjective, and if you can't point to something that's wrong, it's because one person can subjectively evaluate it much differently. You're talking about the audits now. I'm talking about the audit scores. That's correct. In your view, what are the key factors or facts that demonstrate at least that there's a disputed fact over the retaliation claim? Well, I believe the most significant element of the retaliation goes to Heather Clark's approach to Dwight Green, let's move on, let's forget about this, and the fact that when Dwight declined to do that, the termination efforts went forward very quickly. There was some suggestion that maybe they would meet and talk about it, but after he had declined, there was no meeting. Was counsel correct in his description of that discussion that it had to do with Kuhn? Can you work together with Kuhn? Well, I expect that that is Mr. Kuhn's impression of that discussion. No, no. Counsel indicated that the actual statements were made, can you work together with Kuhn and move on. That's not your understanding of that discussion. That's not my understanding, and I think perhaps the testimony that is in the record is different. If you look at what Mr. Green's description of that testimony is and what Ms. Clark's description is, that would again be from her affidavit. Okay. Thank you. Thank you, Your Honor. We would move for review. Yes, thank you. The matter will be submitted. We appreciate your argument.
judges: Wallace, Noonan, Paez